FILED
07/15/2025
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 5, 2025 Session

**ROSALYNN (VICTOR) ADDIS v. RYAN KEITH ADDIS**

**Appeal from the General Sessions Court for Wilson County**
**No. 2020-DC-104   A. Ensley Hagan, Jr., Judge**
_____

**No. M2024-00668-COA-R3-CV**
_____

This appeal arises from a divorce proceeding in which the trial court adopted the wife's marital property division and the wife's proposed permanent parenting plan, found the husband willfully unemployed and imputed his income at $252,850.50 per year for child support purposes, and awarded the wife rehabilitative alimony, alimony *in futuro*, and a judgment in the amount of $43,407.50 for attorney's fees.  Husband appeals.  We affirm in part and vacate in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Affirmed in Part, Vacated in Part, and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and JEFFERY USMAN, JJ., joined.

Wesley Clark, Nashville, Tennessee, for the appellant, Ryan Keith Addis.

Donald Capparella and Jacob A. Vanzin, Nashville, Tennessee, for the appellee, Rosalynn Victor Addis.

**OPINION**

**I. FACTS & PROCEDURAL HISTORY**

Ryan Keith Addis ("Husband") and Rosalynn Victor Addis ("Wife") were married on April 29, 2007, in California.  At that time, Husband was a college graduate and had completed his master's degree in business administration.  Wife had graduated from high school, and at some point, had taken a few community college classes but never obtained a degree.  The couple had two children born during the marriage: a son born in 2008, and

a daughter born in 2014. Wife had worked in mortgage origination, held a California real estate license, and had worked in several administrative and assistant-type roles. However, after the parties' son was born, Wife became a stay-at-home mother and later began homeschooling the children. Husband had a history of working in mortgage origination when the parties married and had owned an interest in a mortgage origination firm when the parties met.

It appears when the couple married that Husband was working as an executive director for an organization called the Latin Business Association, but soon thereafter he transitioned to a position at Bank of America. Shortly before the parties' son was born, Husband resigned from his job at Bank of America because he had determined that he was going to be laid off. The couple filed for bankruptcy later that year and moved in with Mr. Addis's parents for about six months. Husband then began working at Live Oak Bank but was laid off shortly after due to the financial crisis. Husband worked in a variety of business ventures, including a lifestyle magazine and a membership club associated with Four Seasons Hotels and Resorts. Eventually, he returned to the financial industry and accepted a job at Union Bank with the intent to also begin operating his own "search fund" business in which he would search for businesses to acquire, manage, and sell at a profit. Meanwhile, Wife was still acting primarily as a homemaker but did engage in a few part time activities including a part time office management role at a business owned by a friend of Husband, and her own jewelry making business.

Husband was laid off from Union Bank in 2014, at which point he formed a limited liability company known as "Oak Stream Partners" ("Oak Stream"). Oak Stream was a search fund through which Husband sought to identify other companies as acquisition opportunities, negotiate letters of intent to purchase the companies at a certain price and subject to certain conditions, and then work to raise capital from investors to purchase the companies while also using the letters to leverage himself into acting as the companies' CEO. Husband then intended to run any company which Oak Stream acquired for a period of time, improve its operations, increase its value, and then negotiate its sale at a profit. After approximately a year and a half working through Oak Stream, Husband was hired as the Chairman and CEO of SCJ Insurance Services for a salary of approximately $350,000 per year. This salary was well above any Husband had earned in the past. Husband dissolved the search fund, and the family moved from southern California to northern California. He began working as SCJ's CEO in January 2015. Husband worked in this role for almost two years and attempted to find a buyer for the company, but prior to facilitating a sale he was forced to resign from the company in November 2016. It was during this time that Wife began homeschooling the parties' son, who was halfway through kindergarten when the family moved to northern California.

After Husband left SCJ, he again began searching for a company to acquire, run, and sell. In 2013, prior to his involvement with SCJ, he had traveled to Mt. Juliet, Tennessee to contemplate the acquisition of a company called Jupiter Insurance. After

losing his job at SCJ, Husband reestablished contact with the owner of Jupiter Insurance, and the family moved to Mt. Juliet in 2016 as he further pursued the acquisition.[1]  Several of Husband's family members, including his parents, his sister, and his brother had already moved to Mt. Juliet as well.[2]  Husband worked in a consulting type role at Jupiter in contemplation of the purchase being completed.  However, prior to the transaction closing, Jupiter lost certain licenses, and the deal fell through in approximately February 2019.  Husband then began pursuing a similar transaction with an insurance company based in Chicago, Illinois, but this transaction also fell through.  Notably, none of the activities Husband engaged in after his employment at SCJ generated much income.  Therefore, after the move to Mt. Juliet, the family subsisted on savings, investments, and credit cards.  Husband's reported income was as follows for these years: $411,638 in 2016 (largely comprised of Husband's severance pay from SCJ), $23,590 in 2017, and $0 in 2018.  Throughout this time, Wife continued in her role as the homemaker and homeschooled the children while generating little if any income.

At some point, the parties began experiencing marital difficulties, many of which seemed to have stemmed from financial instability as well as relational problems between the spouses.  The parties went through several rounds of marital counseling.  Meanwhile, Husband was offered a job with Moss Corporation in July 2019.  He accepted the position, which paid a very high salary, with the understanding that it would require him to move to Cleveland, Ohio.  Husband subsequently moved to Ohio, and it appears both parties intended that the rest of the family would follow him shortly thereafter.  For the next several months Husband travelled back to Tennessee on weekends while he sought a home for the family.  At one point, he presented Wife with a lease for a house in Ohio which he asked her to sign. Wife refused to sign the lease unless Husband agreed to undergo more marriage counseling, but he refused.  At that point, Husband returned to Ohio, and the marriage underwent more strain.  Husband stopped visiting Tennessee and did not see the children for some time, but this eventually changed.

The children travelled to Ohio for a visit in July 2020, approximately one year after Husband had moved there.  The parties' son was using Husband's phone when he happened upon some notifications from a dating app.  The child informed Wife of this discovery, and the parties officially separated on July 9, 2020.  Wife then filed a complaint for divorce on July 16, 2020.  Shortly after the complaint was filed, Husband lost his job at Moss Corporation.

It is unclear from the record what events then transpired, but the next real movement

---

[1] It appears the parties intended to move to Mt. Juliet prior to Husband leaving SCJ as they purchased the house in March 2016, several months prior to him being forced to resign.  It appears that Husband believed the sale of SCJ was going to occur, at which point the family would move to Mt. Juliet where he would begin looking for his next opportunity.

[2] It appears that Husband's brother also moved to Mt. Juliet at some point, though it is unclear whether this occurred before or after Husband and his family moved there.

in the case did not occur until the parties engaged in an unsuccessful mediation in February 2023. Husband then filed a motion to sell the marital residence, claiming that his income had "declined significantly since the divorce proceedings began" and the parties could no longer afford the mortgage payments. Additionally, Wife filed a motion requesting exclusive possession of the marital residence, approval of a temporary parenting plan, pendente lite spousal support and child support, to maintain the financial status quo, to compel discovery responses and to restrain Husband's trading with the parties' investment and retirement accounts. These issues were addressed in a hearing on May 4, 2023. After the hearing, the trial court entered an order, in which it named Wife the temporary primary residential parent and adopted her proposed temporary parenting plan but denied her request to be awarded exclusive possession of the marital residence. Further, the trial court found testimony from Husband that he had been actively seeking employment was not credible, and stated that if Husband accepted a job he had been offered at Guitar Center paying $20 per hour he would be found to be willfully underemployed. The trial court also ordered Husband to immediately attempt to find a lucrative job to support the family and set the matter for trial, which was to take place beginning on November 28, 2023.

It is unclear exactly what professional or employment activities Husband had participated in during the pendency of the divorce. After he was terminated from Moss Corporation, he apparently began searching for another search fund transaction to pursue but generated most of his income by trading in stocks. He liquidated a portion of the parties' retirement accounts and invested in Tesla stock, which generated a high rate of return. As the divorce proceedings went on, it appears that the majority of the family's expenses were paid by liquidating retirement and investment accounts, savings, and credit cards. It does appear that at some point in April 2022, Husband became involved with a company called Ash, Smoke, and Soot LLC ("Ash"), in some type of interim CEO role. There is nothing in the record describing the business of Ash, or Husband's activities there. This position did not generate as much income as some of Husband's previous ventures but does appear to have paid him some amount of money in 2022. Additionally, he was paid $22,171.96 between January 2023 and April 2023 when it appears the company disbanded. Shortly after this occurred, in May or June 2023 Husband moved from Ohio to Baton Rouge, Louisiana.

Husband attended the May 4 hearing in Mt. Juliet, and while driving back to Baton Rouge, he contacted some of the persons who had been members in Ash. As a result of this, he was able to obtain a job working for Bulldog Adjusters, a company these persons were associated with. This was a public adjusting firm which would represent homeowners in negotiating with insurance companies regarding the proceeds to be paid in the event of a claim. However, after approximately three months, Husband was terminated from this employment in August 2023, when the owners informed him they had misappropriated client funds. Husband then began networking and looking for a new job.

While the divorce proceeding remained pending, Wife filed a motion for attorney's

fees on October 12, 2023. The trial court granted this request in an order entered on October 23, 2023, which directed Husband to withdraw $15,000 from the parties' retirement and/or investment accounts to pay Wife's fees. Husband later filed a request to expend funds from the parties' accounts to pay his own fees, which was granted. The order directed him to withdraw $25,000 from the accounts to pay his fees, as well as an additional $18,036.00 to pay toward Wife's attorney's fees. Subsequently, Wife filed her demand for alimony on November 21, 2023, in which she requested alimony *in futuro*, alimony *in solido*, transitional alimony, and/or rehabilitative alimony in the range of $4,000-$4,500 per month and a reduction to $2,500 per month once the parties' daughter graduated high school. Husband filed a "pretrial statement" in which he stipulated that he had engaged in inappropriate marital conduct and the divorce should be granted to Wife, but maintained the circumstances around the separation and breakdown of the marriage were relevant for alimony calculations. Husband also stated Wife should be named the primary residential parent but requested "large chunks of time during the children's breaks from school." He also requested that income be imputed to both parties based on the evidence of their earning ability. Additionally, Husband requested that child support "be calculated based on imputation of income to both parties based upon the evidence of their respective earning ability."

The trial took place over the course of three days: November 28, November 29, and December 1, 2023. Both parties were 48 years old at the time of the trial and had been married for 16 years. Wife continued to reside in the marital home with both children, with the parties' son being 15 years old and the parties' daughter being 9 years old. Husband was living in Baton Rouge and was still unemployed. However, Wife had begun a part time position with a local real estate agent, which paid her approximately $500 per month.

The trial began with Wife's opening statement in which her counsel requested she be awarded the marital residence, that her parenting plan be adopted but be amended to include Husband's proposal that she have the children for 277 days rather than the 267 she proposed, and again asked for alimony in the amount of $4,500 per month until the parties' daughter graduated from high school, at which point she would receive a reduced amount. Husband then offered his opening statement in which his counsel repeated that Wife was entitled to an alimony award, but asserted she was asking for an unreasonable amount. He acknowledged that Husband's income should be imputed for purposes of calculating child support but asserted it should be based on an average of a long period of his work history in order to account for high earning and low earning years consistent with his earnings throughout the marriage.

Wife testified first. She explained that she was residing in Mt. Juliet, Tennessee, and was still homeschooling the children. Wife was asked about the "story of [her] marriage," and she explained that she met Husband when he hired her to work at his mortgage company. They began dating shortly after and were married in 2007, when Husband had already obtained his bachelor's and master's degrees. She discussed

Husband's work history and explained that his jobs always "revolved around being an executive, a CEO" but stated his income was "somewhat sporadic." She was also asked about the family's moves and stated that they had moved twice during the life of the marriage, once from southern California to northern California, and then again from California to Mt. Juliet. She explained that they moved to Mt. Juliet after Husband left his job at SCJ in part because his parents and sister had moved there, and in part because they did not want to raise the children in California and landed on Tennessee because it "was much more family orientated." She stated that after the move she continued in her role as the homemaker. Wife claimed that the family was not struggling financially at this point as they were able to fall back on Husband's severance pay from SCJ and "he was able to take his time some to get something" but, "three years later, you know, after going through our savings, that Ohio job came up."

Wife was asked why she did not move to Ohio, and she explained that her decision was based on her desire for stability for the marriage and the children. Wife expounded upon this, stating that the parties had been through at least six marriage counselors and had gone through numerous emotional and relational issues which led her to not feeling secure in the decision to move the family unless they took steps to restore stability in the marriage. She acknowledged that when Husband brought up the move she initially agreed, but explained that when he presented a lease, she conditioned her willingness to move on the couple resuming marriage counseling. She stated that Husband refused to attend counseling and told her she was "the only one that need[ed] it." She stated that she later filed for divorce in July 2020 after her son told her about a dating app on Husband's phone. She stated that Husband lost his job at Moss Corporation the next month, and since then he had never obtained another job making similar money.

Wife was also asked about her role in the family, and she maintained that she was the primary caretaker, the one in charge of homeschooling the children, and the one who cared for them when they were sick. She stated that prior to the marriage, she and Husband agreed that she would be a homemaker if they had children. She explained that the parties began homeschooling their son when he was halfway through kindergarten and they moved from southern California to northern California. The parties' son had exhibited severe anxiety in the past when being dropped off at things such as a "Mother's Day Out" program, and they did not want to place him in a new environment so suddenly. She stated that when the parties' daughter reached school age, they continued home schooling because it was working well for the children. When asked about the idea of moving the children to public school, Wife responded that she did not believe it would be in the children's best interest to do so as it would be disruptive to their lives. She explained that the children have been homeschooled almost exclusively and son especially is very connected to his home school group as well as the family's church group.

Wife was also questioned about her employment history. She stated that she never had a salary in the $60,000 to $100,000 range and her highest level of education was a high

school diploma and some junior college classes. She also explained that she did have a real estate license in California, but stated she only had the license because it was required for her "to do the mortgage stuff" in California and that she "really didn't sell real estate." She also stated that after the parties' son was born, she worked part-time in an office doing administrative work for a friend of Husband. She stated that most of her work experience was administrative or clerical in nature, and she was not opposed to engaging in this type of work in the future. She also explained that early in the marriage she would make and sell jewelry, but this eventually turned into more of a hobby than a career. Wife next described her employment at the time of the trial, which was a position for a real estate agent doing marketing and scheduling on a part-time basis. She explained that this position is very flexible with her schedule. She also stated she was going through the course to obtain her Tennessee real estate license, but clarified this was only to help in her assistant role and she would likely not do much selling. She stated that she was working approximately five hours per week at a rate of $25 per hour for a total of $125 per week at the time of trial, and she was unsure how much she would make after obtaining her license. She also stated that she had attempted to find other jobs and had recently begun cleaning houses in order to have money for the upcoming Christmas season. She further stated that she would not be opposed to continuing this type of work and had offered to clean houses for the real estate agent she was working for to place on the market. She stated that she was continuing to search for additional work opportunities, but averred she was limited in the roles she could fill as she could not work full-time and still be able to homeschool the children.

Wife also described Husband's financial situation between the divorce filing and the trial. She stated that she had been unaware that Husband had been cashing out money from their retirement funds to trade stocks but acknowledged the high rate of return. She stated that at one point earlier in 2023, she had learned Husband was working at Ash and that there were several deposits in the couple's checking account between January and March 2023 amounting to $22,171.96. However, she stated Husband informed her that the job ended because "they ran out of funds." She stated that after this Husband obtained the job at Bulldog Adjusters at a salary of $90,000 per year plus a bonus, but he had been terminated prior to trial. She stated that other than these, she was unaware of Husband having had a job since moving to Baton Rouge, and he had not spoken to her about purchasing a company. Wife stated she was unaware of any job keeping Husband in Baton Rouge, but stated that she learned of Husband having entered a consulting arrangement with a travel blogger. However, he was not receiving any regular income from the position, only commission. No payments from the position had ever been placed in the parties' bank account.

Wife also discussed the travel arrangements for the children's visitation. She went through both her proposed parenting schedule and Husband's and noted that one of the main differences was that Husband's plan had the children visiting primarily in the summer months. She stated that the trip from Mt. Juliet to Baton Rouge takes approximately 10

hours and is hard on her and the kids. She also expressed concern with the amount of time the children would spend in Baton Rouge if Husband's plan was adopted. She noted that Husband was living in a one-bedroom apartment at the time of the trial, and the children would miss school and church events, and also did not have any friends in Baton Rouge. She indicated that the children spending basically an entire summer in Baton Rouge would cause the children to miss events in Mt. Juliet and would conflict with the parties' son working a job. She acknowledged that it was in her children's best interests to spend time with Husband, but she also wanted them to be able to spend part of their school breaks in Mt. Juliet. She noted that Husband's plan was vague in that it proposed 50 or 60 days to be spent in Baton Rouge during the summer but no other set times of visitation. She also explained that her plan featured a specific schedule, listing how many days each month would be spent with each parent, which she believed would be in the children's best interests.

Wife next discussed her alimony request. She stated that the house payment at the time of trial was $1,524.12 per month including taxes and homeowner's insurance. She also discussed her income and expense statement for the months leading up to trial which listed her expenses at around $5,000 per month. However, she later explained on recross examination that these expenses represented only the "bare necessities" and that moving forward, she would like to return to a more normal lifestyle and to have money to take vacations and save. Additionally, she estimated that her mortgage payment would likely increase to approximately $2,700 per month if she were forced to refinance the home. While going through her expense sheet, she explained that she was in a precarious financial position and had done things such as discontinuing the lawncare service and an eye therapy the couple's daughter had been undergoing in order to make ends meet. She stated that her need to stay in the house per month was $7,171.12 and her deficit when taking into consideration her job was $6,796.12. She again stated that she was seeking $4,500 per month in alimony until the parties' daughter graduated high school and $2,500 per month thereafter. Wife also clarified that though she had $500 per month listed for legal expenses, the trial court had already ordered them be paid. However, she asked that this amount to be left on the division to permit her to save a bit of money.

Wife then discussed her proposed property division. She stated that in her proposal she was seeking to be awarded all of the equity in the home and had moved as many assets as possible to Husband's portion of the distribution to facilitate that. She explained that the couple had a large amount of credit card and other debts, and she believed it would be equitable to assign the majority of the debt to Husband because his lack of income had driven the accumulation of much of the debt. Further, she stated that while she was willing to refinance the home, she needed at least a year to do so in order to have the necessary documented support from Husband to provide to the lender. She compared this to Husband's proposed division, and her primary concern pertained to Husband's listing of his student loans in the division as they were incurred prior to the marriage.

- 8 -

Later, Wife was asked about Husband's income for child support purposes. She was asked what amount of income she wished to be imputed to Husband based on his earning history and education, to which she responded $314,000 per year. Additionally, Wife stated she was seeking child support in the amount of $2,592 per month as well as an award of attorney's fees. She later testified that this calculation was made with help of counsel using an average of Husband's recent three to five years of income. She also stated that she did not believe years in which Husband earned zero dollars or substantially less than he was capable should be included in his average income. Wife also stated that over the course of the marriage, Husband engaged in the following cycle: "[h]e would make money, he would either quit or get fired, and we would live off of savings and kind of coast, like until push comes to shove, then he'd get a job." This concluded direct examination of Wife.

On cross-examination, Wife was again asked about meeting Husband and their early relationship. She expanded upon her work history at that time, stating she had worked as a loan officer for Husband's company when they met, and had also worked at Liberty Mutual Insurance, as well as a secretary or assistant in a law office, for a builder, and for an investor. Wife was asked whether the "plan" when they got married was to move around the country as he pursued various business opportunities. In response, Wife explained that as a married couple she "would move where there was a job" but regardless of their plan, they had only had two big moves, one from southern California to northern California, and then the move to Tennessee. However, she later agreed that there were periods of time while the couple was living in California that Husband was between opportunities and his only activity was searching for the next one. She also agreed that there was a pattern in which Husband would have a high earning position, it would "go bust," and it would take a couple of years for him to find the next position.

Next, Husband's counsel asked Wife about her attempts to obtain a real estate license in Tennessee. She stated that she expected to be certified within a year. Wife also described her work schedule in relation to the children's schedules and said she would only place them in the public school system as a "last resort." Later, Husband's counsel asked Wife about the retirement accounts Husband had been liquidating. She agreed that Husband would incur tax liability for those distributions but averred that she did not know how much. This concluded Wife's testimony as well as her proof.

Husband was then called to testify. He repeated how he and Wife met and explained his work. He stated that he works either in start-ups or attempts to find existing businesses to purchase, manage, grow, and sell and explained how he founded a search fund in order to do so. Husband then averred that it is difficult for someone of his background and experience to work in traditional companies because he is viewed as a threat to take over or a threat to leave. He also explained that he is not a typical candidate for a normal CEO role as those positions usually require at least ten years in the specific industry. Husband and his counsel then went through his tax returns between 2008 and 2022 to establish his

earning history.  Husband provided a chart in his brief which summarized these returns by organizing his gross income by year, which we have reproduced as follows:

| | | |
|---|---|---|
| 2022 | $ | 18,593 |
| 2021 | $ | 57,472 |
| 2020 | $ | 381,785 |
| 2019 | $ | 123,916 |
| 2018 | $ | 0 |
| 2017 | $ | 23,590 |
| 2016 | $ | 411,638 |
| 2015 | $ | 342,229 |
| 2014 | $ | 57,259 |
| 2013 | $ | 17,449 |
| 2012 | $ | 26,457 |
| 2011 | $ | 40,952 |
| 2010 | $ | 42,800 |
| 2009 | $ | 20,257 |
| 2008 | $ | 92,675 |

Husband then explained his employment history.  He stated that in the late 2000's and early 2010's he had experienced multiple layoffs as a result of the 2008 financial crisis, and this caused the couple to file for bankruptcy.  He said at that point, he went through several other ventures but then returned to the mortgage field for a short time.  He stated that he obtained a job at Union Bank in 2014, in part to provide him with the income needed to rent a home and also to provide him with "potential deal flow" needed to pursue a company acquisition.  However, after a short time, he was again laid off.  At that point, he started Oak Stream partners and began raising money, intending to run the search fund full time.  He explained that he ran the search fund until he was recruited by SCJ, an insurance firm.  Husband further explained that this opportunity arose because the owners of SCJ "naively just thought higher of me than I actually was.  I had no insurance experience whatsoever. . . .  They just offered me $350,000 to start so great.  It was . . . dumb luck."  However, this position lasted only two years and ended without him being involved in a sale.  He asserted that the shareholders were taking too much money out of the company and after he brought a buyer to the board, they forced his resignation and reduced his severance pay.

He stated at this point the family decided to move to Mt. Juliet and claimed this decision was in part based on an "investment thesis" he had developed which indicated the marital home would be lucrative monetary investment based on the existing price and the rate at which the community and surrounding area were growing.  He also stated that he was working to acquire Jupiter Insurance at this time, but the deal fell through, as did a deal he worked on with a company based out of Chicago.  He stated that during this time

period, a typical week of work for him would consist of approximately 50 hours and was spent doing excel sheets to attempt to identify acquisition candidates.

As to his work situation at the time of the trial, he referenced a "work activity journal" he had started in in October 2023 documenting his attempts to find employment. This showed that he had applied for approximately fifty positions. He also stated that he had hired a former soap opera star to coach him in "packaging" his skills and experience in trying to obtain a position. He also explained his arrangement with a travel blogger and their attempts to create a travel television show to be picked up by PBS as the next "Rick Steves' Europe kind of show." He stated that other than this arrangement, he had only been able to find work at Bulldog Adjusters, but explained that position had ended when it was revealed the owners had been stealing money from clients and he was terminated. He stated that after this he went back on the job hunt which continues. He stated that he did not have a regular source of income at the time of the trial and that his arrangement with the travel blogger is contingent. Regardless, Husband averred that he was using his best efforts to generate a large amount of income and the only time in his life he was not actively engaged in furthering his job prospects was when he was finishing his M.B.A. prior to the marriage. Husband discussed his education a bit more thoroughly at that point and explained that Pepperdine University where he attained his M.B.A. was not as prestigious as he had believed prior to enrolling, and this had hindered his ability to work. He was then asked what he believed to be a fair method of calculating his income to which he responded that a five-year average of his income would be appropriate as he is only paid when he attains the high paying jobs. He contended that it takes a lot of work and effort to obtain those jobs and it would be "unrealistic and completely absurd" to discount that work.

Next, Husband discussed his student loan balance which at the time of the trial was $145,947.41. He explained that, while the loans had been in deferment, this would not continue. Because he was on an income-based repayment plan, his expenses regarding those loans were likely to increase. Husband later explained that he always paid toward his student loans during the marriage unless they were in deferment, and this happened at times he was low on cash such as when the parties went through their bankruptcy. He stated that he would place the loans in deferment in order to meet the family's needs when money was scarce, but while he was working at Moss Corporation and earning a high income, he chose to pay down the family debt rather than his student loans.

Husband also discussed his financial situation at the time of the trial. He stated that he had been living on credit cards and acknowledged that certain "dating expenses" should be counted against him in the property division. At this point, Husband explained how he met his paramour at a professional event when he was working for Ash. She was the owner of a public adjusting firm with which Husband was trying to obtain a consultant contract. The two met while he was still living in Ohio, and she was living in Baton Rouge. Husband denied moving to Baton Rouge to be with his paramour and claimed the two were broken up at that time. Rather, he asserted that he had moved to Louisiana because he had been

- 11 -

"sponsored" by a business in Florida which specialized in roof repair and restoration and therefore he needed to move somewhere where there was "storm activity." He further explained that he knew that he needed to stay within a 500-mile radius of Mt. Juliet, so he chose Louisiana. He also cited the climate, the prevalence of churches in the area, and the opportunity to pursue an acquisition as reasons he chose to move there.

Husband was then asked about the deterioration of the marriage, and he indicated that financial stress was an issue. He explained that while the parties were living in Mt. Juliet, they began to run out of money after his pursuit of transactions was unsuccessful. At the time he was looking for the Ohio job, the family had a net worth of approximately negative $40,000, was incurring more credit card debt, and had only 30 days of cash on hand. He stated that when he received the offer for the job in Ohio it was an answered prayer and that he anticipated his family would move with him. He then claimed that when Wife refused to move he considered this an abandonment of the marriage as well as an impediment to his access to the children. Husband was asked whether he had any issues regarding Wife's testimony. He responded that Wife had made several "unfounded claims" against him as it pertained to his employment, and there was a "crystal clear explanation on everything" citing his taxable income for 2023 which at the time exceeded $160,000. He further explained that he did not have incentive to maintain a low income, and the situation was "eating into [his] IRAs" and he would likely leave the marriage with a negative net worth. Husband was then asked about the parenting plan arrangement. He asserted that Wife being forced to drive the children halfway to Baton Rouge for parenting visits was a "repercussion" to her refusal to move. He agreed that this was why he proposed in his parenting plan that he should be permitted to exercise his parenting time in "large blocks" based on the children's school schedule. He went on to suggest that the children be placed in public school to permit Wife "flexibility" as she pursued a new career, and this would permit her to work full-time.

Husband also averred that his proposed parenting plan was designed to provide him with flexibility, which he would need once he found his next job. Additionally, he maintained that his proposal would be superior to Wife's because his resulted in a few long trips, whereas Wife's required a road trip 10 or 11 months per year. Despite claiming he hated the term, Husband referred to an arrangement known as the "Disneyland dad schedule" in which more time with the non-custodial parent was scheduled during summer vacation and other breaks. He stated this would make more sense for their situation as it would permit fewer drives and permit him to take visits to Mt. Juliet if he had the funds. When asked about his reasons for not moving back to the Mt. Juliet area, Husband responded that he would not move back because Wife had abandoned the marriage and he did not want to move back without a job and get the children's hopes up because he would leave again if offered a good job. He further stated that visitation in Mt. Juliet would be inconvenient for him as he had to stay in a hotel because his parents' and sister's homes were too crowded with people and animals. Additionally, Husband explained that he does not have a relationship with his brother and his brother's wife is Wife's best friend.

Therefore, it would be unsuitable for him to exercise parenting time at their home which was also located in the Mt. Juliet area.

Husband next discussed the property division. He explained that he wanted the divorce finalized because it had required him to cover the expenses for two households and held him "back from moving [his] career forward" as he could not obtain "financing, like an SBA loan through this, unless this is settled." He further stated that he believed a 50/50 division would be fair especially given his student loan situation, and he wanted the student loans weighed as a factor in the trial court's decision. Husband also indicated that he believed the marital residence needed to be sold to remove the debt from his record for financing purposes as well as providing him with some capital to be used in his pursuit of a business transaction. He indicated that the home had been purchased partially as an investment and that he needed to leverage the equity in the home. He was also concerned that the number of new homes being built in the area would hurt the home's value. He later explained that the sale of the home would provide both parties with up to $250,000 worth of tax-free income.

Husband also discussed some of the tax consequences incurred as a result of his income and the distributions from the retirement accounts taken in 2023. Approximately $121,338 of Husband's 2023 gross income of $162,686 was attributable to distributions taken from the couple's Roth IRA and traditional IRA accounts. Husband submitted several IRS publications as exhibits, demonstrating that there is a 10% penalty associated with taking early distributions from a Roth IRA or traditional IRA. He also stated that he was not eligible for any of the exceptions and asked that he be awarded the tax credits associated with the children for the year.

Direct examination concluded with Husband again explaining the "cycle" of his work acquiring companies. He stated the process typically takes an average of two years but noted that "[o]nly 60 percent do it within that time frame." He also represented that his arrangement with the travel blogger was picking up steam and that he was interviewing at a venture capital firm where if hired he would earn between $4,000 and $5,000 per month. He then explained that he had been attempting to close a transaction his entire career and explained that if he was successful, "I may get, say, 10 million dollars out of it. So why -- why would I risk not doing that because of a pending divorce? This would be chump change to settle if I actually got to that point." Husband then reaffirmed his opinion that the house needed to be sold so he could pursue a transaction.

On cross-examination, Husband reiterated that he is searching for the opportunity to purchase a company with investors, run, and sell it at a profit, but acknowledged this work does not earn much if anything in low years despite it being his primary activity. He stated that he lived off credit cards in those low years in addition to savings, but asserted he did not live off retirement funds until 2023. At this point, Husband was asked whether he had actually closed on a transaction in accordance with this plan. Husband

acknowledged that he had not but maintained he had generated an income in the past which most people would deem successful. Husband was also asked about his attempts to find employment. Husband had previously submitted a list of the jobs he had applied to, but when asked about the percentage of those jobs which were executive types of positions, he was unhelpful in determining the percentage. Husband noted, "that's only half my journal" and when asked whether it was what he submitted to the court, stated, "I don't recall. My attorney can answer that." Husband was asked about several specific companies and whether he had applied to them, to which he only responded, "I don't recall." Husband was also asked about how he went about obtaining the job with Bulldog Adjusters. He stated that he did call the company after leaving the May 4 hearing but asserted it took more than just the phone call to obtain the job, as it was based on his previously established relationship with Ash shareholders who owned Bulldog Adjusters.

The parties both offered closing statements, and Wife's counsel stated that if awarded the marital home, she would be willing to refinance but asked for a year from the date of the divorce to do so. There was also some discussion between the trial court and the parties as to whether they would prefer the order be entered prior to the end of 2023, as waiting until 2024 could have some potential tax benefits to the parties as they would be permitted to file as married. The trial court stated that the parties would be permitted to speak to CPAs regarding the situation. This concluded the trial.

Husband filed a motion to ascertain the status of the case on February 22, 2024, and while the motion included a notice of hearing for February 29, 2024, it is unclear whether that hearing took place. Subsequently, both parties submitted affidavits regarding the attorney's fees accumulated throughout the life of the case. Wife's affidavit contained a breakdown of the rates and hours charged, and listed fees in the amount of $43,407.50 for charges dating to the beginning of the proceedings in July 2020. In the "amount paid" portion of the document, the value listed was $0.00.

On March 8, 2024, the trial court sent the parties its findings of facts and conclusions of law. The trial court entered the final decree of divorce incorporating those rulings and findings on April 10, 2024. The trial court made several findings of fact regarding Husband's behavior during the divorce proceedings. First, the trial court found that Husband moved to Baton Rouge "for his paramour" rather than for employment opportunities. Additionally, the trial court found that Wife "clearly has a financial need and is the financially disadvantaged spouse." The trial court also found Husband to be willfully unemployed based on him having been out of work for three years despite his high earning capacity. The trial court explained this finding, stating that, "Husband wants to claim that he is hunting for the right opportunity to buy and sell companies, all the while depleting the family's assets paying for daily needs." The trial court acknowledged that Husband had experienced success trading stocks but that it was not a steady source of income. The trial court also acknowledged Husband's goal of buying, building, and selling a company at a large profit but noted "those opportunities do not come around often as

- 14 -

evidenced by Husband's work history." The trial court also found that Husband had been willfully unemployed "at different times during the marriage." The trial court noted "that a person with [Husband's] education, employment history, success, and earning ability should have no difficulty finding gainful employment, but Husband ha[d] chosen not to work because exactly what he wanted was not readily available." The trial court stated that, "Husband believed he deserved a top job, and not just a good job that would allow him to support his family and not deplete marital assets." However, the trial court also found that Husband's depletion of assets did not constitute dissipation.

Next, the trial court went through its findings for the imputation of income to Husband for child support purposes. The trial court stated that "Husband's income [was] not easily discernible" and listed several considerations. The trial court stated that Husband earned $1,657,071.90 over the first 14 years of the marriage but expressed concern that this average "include[d] years of zero (0) income and what the [trial court] [would] classify as nominal income when Husband was out of work." The trial court stated that "[i]t would be unfair and inequitable to consider the years Husband was choosing not to work in determining Husband's actual earning ability, especially in light of the fact that Husband testified that each time he left one of his high-paying jobs, he was either terminated or he quit to avoid being terminated." The trial court then compared Wife's request that Husband's income be imputed at $314,892 per year to Husband's request it be imputed at an average of his previous five years of earnings and determined neither of these amounts to be appropriate. Rather, the trial court determined that his income should be imputed at $252,850.50 per year, which represented an "average of the last two (2) years (2019 and 2020) that Husband was actually gainfully employed." The trial court imputed this amount "for child support purposes" and imputed Wife's income based on a lack of reliable evidence in accordance with the child support guidelines at $35,936.00 per year.

Additionally, the trial court adopted Wife's proposed permanent parenting plan, which named her as the primary residential parent, assigned her 267 parenting days and Husband 98 parenting days, and adopted a visitation schedule which required Husband to travel to Nashville to exercise some of his parenting time. This schedule also featured frequent periods of parenting time for Husband as there was a period of visitation in 10 of 12 months. Notably, the trial court noted that Husband's "choice to move from Ohio to Baton Rouge, LA, instead of returning to Middle Tennessee once the Ohio job ended, [was] a significant factor for the Court, as it demonstrate[d] [Husband's] priorities." Based on these figures, the trial court awarded Wife child support in the amount of $2,177.00 per month.

The trial court also adopted Wife's proposed property division and found that it was fair and equitable pursuant to the statutory factors enumerated in Tennessee Code Annotated section 36-4-121. The trial court went through each of those factors individually. Wife was awarded the marital residence which was to "be divested out of Husband and vested into Wife." The majority of the bank and investment accounts were

awarded to Husband, and a majority of the parties' debts were likewise assigned to him. The trial court also considered Husband's student loan situation, stating that, "Husband shall be solely responsible for any and all student loans owed to Navient and shall hold Wife harmless from any and all liability therefrom." The trial court also noted the tax consequences of the parties' situation, stating, "[t]he parties have accumulated significant capital gains due to the sale of stocks to keep the family afloat. Otherwise, the division of the marital estate does not have significant tax implications to either party." Additionally, when assessing the economic circumstances of the parties, the trial court found the circumstances were "not great at the time of the division of the marital estate due to Husband's decision to remain unemployed." The trial court went on to state that, "[i]t appear[ed] to the Court this unemployment choice by Husband ha[d] been some kind of strategy to gain an advantage in the divorce proceedings." The trial court noted that had he been earning income he was capable of earning during the pendency of the divorce, there would be a much larger marital estate to divide.

The trial court next discussed its award of alimony to Wife. The trial court went through the factors to be considered in making a spousal support award outlined in Tennessee Code Annotated section 36-5-121(e)(1). The trial court again noted that Wife was the financially disadvantaged spouse and found it would "be difficult and undesirable for Wife to seek full-time employment outside the home because the parties' children are both still minors and Wife is and will be the Primary Custodian of the children seventy-three percent of the time with the Court's adopted Permanent Parenting Plan." The trial court also cited the fact that Wife would continue to homeschool the children in making its determination. The trial court awarded Wife rehabilitative alimony in the amount of $3,000.00 per month for 36 months and then a reduced amount of $2,000 per month for the following 60 months. The trial court also awarded Wife alimony *in futuro* in the amount of $1,500 per month, which was to commence upon the expiration of the rehabilitative alimony award. Finally, the trial court awarded Wife a judgment against Husband in the amount of $43,407.40 to cover the attorney's fees and costs incurred by Wife in this matter.[3] This number accounted for the balance of the fees accumulated since the proceedings began in July 2020. Husband filed this appeal.

## II. Issues Presented

Husband has presented the following issues on appeal which we have slightly reframed:

1. Whether the trial court made sufficient findings of fact pursuant to Tennessee Rule of Civil Procedure 52.01 when it determined Wife was

---

[3] While the order stated it awarded both fees and costs, the trial court's numerical award appears to only contemplate the $43,407.50 in fees accrued, as it does not account for the $1,127.60 worth of expenses listed in the affidavit.

entitled to an award of alimony *in futuro* and whether the trial court awarded excessive alimony *in futuro* and rehabilitative alimony.

2. Whether the trial court abused its discretion in dividing the marital estate by failing to set a timeframe for the sale or refinancing of the marital residence or by not properly considering Husband's student loan debt when dividing the marital property.

3. Whether the trial court abused its discretion in requiring Husband to travel from Baton Rouge to Nashville to exercise portions of his parenting time.

4. Whether the trial court abused its discretion by finding Husband willfully underemployed in calculating his income for child support purposes.

5. Whether the trial court abused its discretion by awarding attorney's fees to Wife.

In addition to answering Husband's issues, Wife presents the following issue on appeal:

1. Whether Wife is entitled to an award of attorney's fees on appeal.

For the following reasons, we affirm in part and vacate in part the judgment of the trial court.

## III. Discussion

Before assessing the issues presented above, we note that the review of certain issues in a divorce proceeding can affect the consideration of others. As we have previously explained:

The dissolution of a marriage requires the courts to engage in the orderly disentanglement of the parties' personal and financial affairs. Many of the issues that must be addressed during this process are interrelated, and the disposition of earlier issues directly influence the decision on later issues. Accordingly, the parties and the courts should pay careful attention to the order in which the various issues in a divorce case are addressed and decided.

As a general rule, the first issue considered in a divorce case concerns whether either or both parties have demonstrated that they are entitled to a divorce. Thus, at the outset, trial courts should first determine to whom the divorce should be awarded or whether the parties should be declared divorced in accordance with Tenn. Code Ann. § 36-4-129 (1996). Following this decision, trial courts should turn their attention to the custody and visitation arrangements for the children if the parties have minor children entitled to support. Only after these status issues have been decided should trial courts turn their attention to the financial aspects of the divorce decree.

- 17 -

The trial court's first task following the resolution of the status issues is to identify and distribute the parties' separate property and then to divide their marital property in an equitable manner. As part of this process, the trial court should also identify and allocate the parties' separate and marital debts. Sorting out the parties' property interests must precede support decisions because the manner in which the separate and marital property is divided can affect later support decisions.

After the parties' property interests have been addressed, trial courts should then turn their attention to child support. This is precisely what this court directed the trial court to do in its first opinion in this case. Child support decisions should precede decisions about spousal support because a spouse's ability to pay spousal support may be directly and significantly influenced by the amount of child support he or she has been ordered to pay.

Consideration of spousal support questions should follow the disposition of all the preceding questions. Once a court has determined whether spousal support should be awarded, and if so its nature, amount, and duration, it should, as a final matter, address any request for attorney's fees if such request has been made.

*Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998) (internal citations omitted) *see Durunna v. Durunna*, No. M2022-00415-COA-R3-CV, 2024 WL 1448142, at *1-2 (Tenn. Ct. App. Apr. 4, 2024). Accordingly, we do not address Husband's issues in the same order in which he has listed them. Rather, as no issue has been raised regarding the trial court's declaration of divorce, we begin our review with Husband's issue concerning the visitation arrangements for the children.

### A. Visitation Schedule

Husband complains that the trial court abused its discretion when it required him to travel from Baton Rouge to Mt. Juliet to exercise parenting time. Husband sought a parenting plan in which the children would travel to Baton Rouge at less regular intervals but for longer periods of time and had him exercise less parenting time in Mt. Juliet. He claims that the "rejection of [his] reasonable request is contrary to the weight of the evidence and results in an illogical conclusion" constituting an abuse of discretion. While somewhat unclear from the brief, it appears that Husband asks the parenting plan to be amended to reflect the parenting schedule put forward in his proposed plan.

When a trial court is required "to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child." Tenn. Code Ann. § 36-6-106(a) (2016). "In taking into account the child's best interest, the court

shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in [] subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors." *Id.*[4]  As we have previously explained, "[t]rial courts are afforded 'broad discretion to fashion custody and visitation arrangements that best suit the unique circumstances of each case, and the appellate courts are reluctant to second-guess a trial court's determination regarding custody and visitation.'"  *Mejia v. Leone*, No. M2024-00303-COA-R3-CV, 2025 WL 926632, at *3 (Tenn. Ct. App. Mar. 25, 2025) (quoting *Grissom v. Grissom*, 586 S.W.3d 387, 391 (Tenn. Ct. App. 2019)).  Further, a trial court's determination regarding "custody and visitation 'will not ordinarily be reversed absent some abuse of that discretion.'"  *Id.* (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)).  As explained *supra*, "'[a]n abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.'" *Mayfield v. Mayfield*, 395 S.W.3d 108, 114-115 (Tenn. 2012) (quoting *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)).

Again, Husband presents no case law to support his argument, but instead relies on an assessment of the best interest factors applicable to child custody determinations in Tennessee.  Tenn. Code Ann. § 36-6-106(a)(1)-(15) (2016).  Husband relies on the "any other factor" provision contained in Tennessee Code Annotated section 36-6-106(a)(15) (2016).  Husband claims his plan was more reasonable than the one adopted by the trial court because it relieves him "of the burden imposed" by the road-trips to Nashville, permits him to exercise parenting time in his home rather than a hotel or another person's residence, and is consistent with the trial court's expectation he should be working a full-time executive job.

While we are cognizant of Husband's dissatisfaction with the adopted plan, he has not demonstrated that an abuse of discretion has occurred.  In its final order, the trial court went through each of the factors listed in the statute.  If a factor weighed on the analysis, the trial court explained how it was weighed, and if it did not, the trial court placed an "N/A" next to the factor, indicating as much.  Additionally, the trial court found that the plan was in the children's best interest "as it allows the parents to maximize the time with the children considering their respective residences pursuant to the mandate in Tenn. Code Ann. § 36-6-106."  Wife testified regarding the negative impacts the trip had on her and the children, as well as the monetary expense tied to staying in a hotel room to break up

---

[4] The divorce action was filed in 2020 but did not proceed to trial until 2023.  During that time, what is now factor (15) was added which permits consideration of "[w]hether a parent has failed to pay court-ordered child support."  Tenn. Code Ann. § 36-6-106(a)(15).  The trial court listed this factor in the final order as the sixteenth factor in its analysis, but in the explanatory portion only put "N/A."  It is unclear whether it determined the factor was inapplicable due to its adoption after the case began or because there had been no failure to pay court ordered child support.  Regardless, any error which may have resulted from consideration of this additional factor was harmless as it was not given any weight in the analysis.

the trip. This evidence supports the trial court's decision to require fewer trips, as well as easing the burden on Wife by requiring Husband to carry the children to Baton Rouge for extended visitation after he has been visiting for a birthday and by requiring him to bring the children home at Christmas.

Perhaps most telling was the trial court's assessment of factor (15). The trial court stated that Husband's choice to move to Baton Rouge rather than Middle Tennessee after he lost his job in Ohio was "a significant factor for the Court, as it demonstrate[d] [Husband's] priorities." Clearly, the trial court considered the testimony pertaining to Husband's move to Baton Rouge and determined his motives were not in the best interests of the children. Accordingly, the trial court adopted a plan that would be less disruptive to the children as they would spend more time in the Mt. Juliet area and placed more of the onus of travel on Husband. While Husband is clearly unhappy with this decision, he has not pointed to any portion of this analysis and explained how it was against the weight of the evidence.

Nor has Husband demonstrated that the analysis resulted in an illogical conclusion. The schedule does not require that he travel to Mt. Juliet every time he is to exercise parenting time. Rather, it requires him to travel to Mt. Juliet for two five-day increments surrounding the Martin Luther King Jr. Day and Easter holidays, one additional five-day increment for the parties' son's birthday, and one four-day increment leading up to the parties' daughter's birthday at the end of which he is to transport the children back to Louisiana for a longer period of visitation. Additionally, he is required to bring the children to Mt. Juliet at the conclusion of the Christmas break spent in Louisiana and to spend the evening of December 23rd with them in Mt. Juliet. This would account for approximately 20 of Father's 98 days and results in him taking five road trips to Mt. Juliet. Nothing appears to be illogical about this arrangement. It permits the children to see both parents for the celebration of various holidays and their birthdays which is in accordance with the General Assembly's instruction that a parenting arrangement shall be determined which "permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection." Tenn. Code Ann. § 36-6-106(a). The plan also permits the children to see Husband in 10 of 12 months each year. At trial, though loathe to do so, Husband referenced his wish to be a "Disneyland Dad" in that he wanted long stretches of parenting time rather than visits spread out amongst 10 of 12 months in a year. However, he has not shown that this arrangement would better serve the children's best interest or that its rejection was illogical, unreasonable, or otherwise some abuse of discretion. Finding no abuse of discretion, we affirm the visitation schedule ordered by the trial court.

### B. Property Division

Next, Husband asserts that the trial court erred in its division of the marital estate in the following ways: (1) it ignored his student loan obligations, (2) it did not properly

- 20 -

consider the tax consequences of the retirement distributions taken prior to the trial, and (3) it failed to properly assign and dispose of the mortgage associated with the marital home. To cure these ills, Husband requests that he be awarded $40,000 of the equity in the marital residence and Wife be ordered to either sell the residence or refinance the mortgage into her name within 90 days.

"When dividing property in a divorce, the trial court must first classify property as marital or separate[.]" *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001). Once property has been categorized as marital or separate, "the court should place a reasonable value on property that is subject to division." *Luplow v. Luplow*, 450 S.W.3d 105, 109 (Tenn. Ct. App. 2014) (citing *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003)). Next, "the trial court is to divide the marital property in an equitable manner." *Id.* (citing Tenn. Code Ann. § 36-4-121(a)(1); *Miller*, 81 S.W.3d at 775). "The equitable division of marital property is a fact-intensive inquiry involving the careful weighing of the relevant statutory factors." *Brainerd v. Brainerd*, No. M2015-00362-COA-R3-CV, 2016 WL 6996365, at *5 (Tenn. Ct. App. Nov. 30, 2016). Notably, "marital debts are subject to equitable division in the same manner as marital property." *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). "The trial court has broad discretion in fashioning an equitable distribution of marital property, and an appellate court will defer to the trial court's distribution unless it is inconsistent with the statutory factors or lacks proper evidentiary support." *Trezevant v. Trezevant*, 568 S.W.3d 595, 607 (Tenn. Ct. App. 2018) (citing *Baggett v. Baggett*, 422 S.W.3d 537, 543 (Tenn. Ct. App. 2013)).

We have previously explained that "[a] division of marital property is not rendered inequitable simply because it is not precisely equal." *Altman v. Altman*, 181 S.W.3d 676, 683 (Tenn. Ct. App. 2005) (citing *Roberston v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002); *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996)). Further, "[o]n appeal, it is not our role to tweak the manner in which a trial court has divided the marital property." *Marciante v. Perry*, No. M2006-02654-COA-R3-CV, 2008 WL 820502, at *10 (Tenn. Ct. App. Mar. 26, 2008) (citing *Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007)). "'Rather, our role is to determine whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the factors in Tenn. Code Ann. § 36-4-121(c) is consistent with logic and reason, and whether the trial court's division of the marital property is equitable.'" *Id.* (quoting *Owens*, 241 S.W.3d at 490).

We would note that there is no dispute as to the classification or value of the property making up the marital estate. Rather, Husband only argues the division was inequitable pursuant to the factors outlined in Tennessee Code Annotated section 36-4-121(c).

*1. Student Loan Obligations*

Husband claims that the trial court abused its discretion by not considering his student loan obligations. Importantly, Husband agrees that his loans are properly classified as his separate debt as they were incurred prior to the marriage. Nevertheless, Husband claims that his decisions during the life of the marriage to invest and to pay marital debt during his high earning years instead of his personal student loan debts should net him a higher distribution of the marital estate than that which he was awarded.

Husband has not cited any caselaw supporting this claim but does assert the loans should be considered as weighing on his economic circumstances, and as a factor necessary for an equitable distribution pursuant to Tennessee Code Annotated section 36-4-121(c)(8) and (12). The trial court's consideration of the equitable factors does touch on the existence of the student loans. The trial court considered them in contemplation of factor (2) as a financial liability of a party. Specifically, the trial court stated that the student loans and marital debts were "not greater than Husband's earning capacity." As to the factor (8) raised by Husband, the trial court stated that the economic circumstances of the parties at the time of division were "not great" but attributed this to "Husband's decision to remain unemployed" rather than to the parties' debts.

Clearly the trial court was cognizant of Husband's student loan obligations when dividing the marital estate. Further, the trial court made findings as to the effect the parties' debts, including the student loans would have on its division of the property. Obviously, Husband wanted the loans considered in his favor, but he has not demonstrated how the trial court's treatment of his student loans was illogical, unreasonable, or otherwise an abuse of discretion.

### 2. Tax Bill and IRA Penalties Associated with 2023 Income

Husband next contends that the trial court did not properly consider the income tax and penalties he would owe for the 2023 tax year when formulating the property division. Again, Husband has not provided us with case law to assess previous treatment of this type of argument but rather asserts the tax bill should be considered pursuant to factors outlined in Tennessee Code Annotated section 36-4-121(c). We have previously opined that tax consequences are to be considered in making an equitable distribution of marital property. *Fulbright v. Fulbright*, 64 S.W.3d 359, 366 (Tenn. Ct. App. 2001) (citing Tenn. Code Ann. section 36-4-121(c)). Husband's claim is predicated on his own projections of the tax liability, which he provided at trial and estimated would total approximately $43,154.81 based on his total income of $162,686. He noted that this liability included 10% penalties associated with early distributions taken from the parties' IRAs. Husband provided the following chart to demonstrate how he projected his tax bill:[5]

---

[5] Husband's projections are based on his income only and do not include any income Wife may have earned from her part-time employment.

| A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|
| | Income brackets | | Tax Rate | | Income 2023 | Taxes | |
| | $ - | $ 11,000 | 10.00% | | $ 11,000 | $ 1,100.00 | |
| | $ 11,000 | $ 44,725 | 12.00% | | $ 44,725 | $ 5,367.00 | |
| | $ 44,725 | $ 95,775 | 22.00% | | $ 51,050 | $ 11,231.00 | |
| | $ 95,775 | $ 182,100 | 24.00% | | $ 55,911 | $ 13,419 | |
| | $ 182,100 | $ 231,250 | 32.00% | | $ - | $ - | |
| | $ 231,250 | $ 578,100 | 35.00% | | $ - | $ - | |
| | | | | | $ 162,686 | $ 31,117 | Tax |
| | | | | | | $12,133.81 | Penalty (10% of IRA dist.) |
| | | 2023 | Income | $162,686 | | $43,154.81 | 2023 Tax + Penalty |

The income is derived from:
$22,684.00 in income from Ash, Smoke, and Soot, LLC
$18,664.06 in income from Bulldog Adjusters
$49,032.00 in distributions from traditional IRA
$72,306.06 in distributions from Roth IRA

$162,686 total income 2023 (including a total of $121,338 of distributions subject to 10% penalty pursuant to 26 U.S.C.A. § 4975, I.R.C. § 4975).

The trial court acknowledged the parties' tax situation when it analyzed the economic circumstances of the parties pursuant to Tennessee Code Annotated section 36-4-121(c)(9) stating, "[t]he parties have accumulated significant capital gains due to the sale of stocks to keep the family afloat. Otherwise, the division of the marital estate does not have significant tax implications to either party."[6] Husband points out that he has not generated capital gains by withdrawing from the retirement accounts, but has instead generated income. While this sentiment is correct, it does not demonstrate that the trial court did not consider the tax situation when issuing its order, and any mischaracterization of the tax liability as capital gains rather than regular income was harmless error. The evidence regarding Husband's expected bill was entered as an exhibit and the trial court clearly had the tax situation of the parties in mind at the trial as it instructed the parties to report whether it would be to their advantage to wait to make the divorce final after the end of 2023, which Husband indicated would likely lessen the tax bill. Clearly, the trial court was cognizant of the parties' tax situation when formulating its property division.[7] Having

___

[6] The trial court instructed the parties to consider their tax situation prior to the entry of the order to determine which filing status would be most advantageous to them. However, there is nothing further in the record indicating which status was chosen or the actual tax bills the parties incurred for the year.

[7] Further, Husband has not demonstrated that his calculations were accurate. While Husband's calculations do account for the marginal tax brackets used for federal income tax purposes and for the 10% penalty associated with early distributions from IRA accounts, there is no indication that he accounted for any income deductions or tax credits in calculating his potential tax bill. For example, it does not appear Husband subtracted even a standard deduction from his gross income in estimating the bill. Rather his entire gross income of $162,686 is listed in the chart. Additionally, it does not appear Husband has accounted for the rules which apply to Roth and traditional IRA accounts, as he simply listed the full amount

- 23 -

reviewed the record, there is no indication that the weight the trial court gave to the parties' tax circumstances in forming its property division was unreasonable, illogical, or otherwise constituted an abuse of discretion.

### 3. Mortgage Assignment

Husband also contends that the trial court erred by not including a provision requiring Wife to sell or refinance the marital residence within 90 days in its final order. He asserts this constitutes a failure to properly allocate the mortgage debt. However, Husband acknowledges that the trial court's award "implicitly" assigned the mortgage to Wife. This is confirmed by the property division worksheet attached to the final order and incorporated by reference. The worksheet places the home in Wife's portion of the distribution at a value of $263,423.35, which represents the difference between the fair market value of $525,000 and the debt of $209,576.65 owed on the home and some other fees associated with refinancing. Husband's concern pertains to Wife not having been required to refinance the mortgage into only her name within a certain period of time. He claims that the mortgage remaining on his credit report will impede his ability to attain financing for business opportunities as he would remain liable for the debt without any right to the underlying asset.

Based on the trial court's property division chart and the representations of the parties, it does not appear that the trial court failed to allocate the mortgage debt. It clearly intended for Wife to take both the equity in the home and to assume the mortgage debt based on its calculations in the property division worksheet. However, it does appear to have neglected to order Wife to refinance the home within a certain period of time or to have added a hold harmless provision to ensure Husband would not be held liable for the mortgage. During the trial, Wife stated that she would be willing to refinance the home but requested a year within which to do so to obtain the necessary proof of income. We have recently remanded a case to the trial court for entry of a revised order where a party to a divorce was not ordered to refinance the marital home within a specific span of time. *See Henry v. Henry*, No. M2024-00030-COA-R3-CV, 2025 WL 304573, at \*10 (Tenn. Ct. App. Jan. 27, 2025) (remanding a cause to the trial court for entry of a revised order "to include the obligation [to refinance the marital residence]" where it had inadvertently excluded such a requirement from the order). We find no error in the trial court's decision to award the home to Wife. However, we must remand this portion of the order so that it may be revised to include language requiring Wife to refinance the home into her name within a span of time deemed reasonable by the trial court and to add a provision holding Husband harmless from the liability associated with the asset.

---

of the distributions in the income column. These factors indicate that the $43,154.81 of income tax bill estimated by Husband was likely inaccurate.

For clarity, we find the trial court did not abuse its discretion in making its equitable division of the marital property and its rulings as to that portion of the order are affirmed. However, the failure to require Wife to refinance the mortgage into her name appears to be an oversight similar to the one in *Henry*. Accordingly, we remand this cause for the order to be revised to include language requiring her to refinance the home within a certain time frame to be discerned by the trial court, and to include a provision holding Husband harmless from any liability associated with the debt.

## C. Child Support

Husband also raises issue with the trial court's determination that he was willfully unemployed and its decision to impute his income at $252,850.50 per year for child support purposes.[8] Husband acknowledges that his income should be imputed at some level but maintains a five-year range of his earnings is appropriate, as it would encapsulate the cyclical nature of his earnings which was common over his career.

"Generally, the most important finding in a child support proceeding is the obligor's income." *Eldridge v. Eldridge*, 137 S.W.3d 1, 20 (Tenn. Ct. App. 2002). A parent's income is calculated in accordance with the provisions of the Tennessee Child Support Guidelines. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a). The Guidelines permit courts to "'impute' income to a parent, that is, assign or attribute an income level to the parent that may not reflect the parent's actual gross income" in certain situations. *Massey v. Casals*, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009). Imputation of income is predicated on the proposition "that parents may not avoid their financial responsibility to their children by unreasonably failing to exercise their earning capacity." *Id.* The Guidelines provide that, "[i]mputing additional gross income to a parent" is appropriate where "a parent has been determined by a tribunal to be willfully underemployed or unemployed." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i)(I). In making such a determination, "[t]he Guidelines do not presume that any parent is willfully underemployed or unemployed" but rather the court is "to ascertain the reasons for the parent's occupational choices, to assess the reasonableness of these choices in light of the parent's obligation to support his or her child(ren), and to determine whether such choices benefit the children." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii). Importantly, "[a] determination of willful underemployment or unemployment is not limited to choices motivated by an intent to avoid or reduce the payment of child support." 1240-02-04-.04(3)(a)(2)(ii)(I). "The determination may be based on any intentional choice or act that adversely affects a parent's income." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(I). Additionally, the Guidelines enumerate certain specific factors to be considered including the parent's past

---

[8] Husband's brief actually raises issue with him being deemed "willfully underemployed." However, as the trial court's ruling deemed Husband "willfully unemployed" we will address the issue in that context.

- 25 -

and present employment, education, training, and ability to work. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii)(I-II).

Generally, "[t]his court's review of a trial court's decision as to child support is reviewed under an abuse of discretion standard." *White v. Miller*, No. M2021-01189-COA-R3-JV, 2023 WL 4853361, at *4 (Tenn. Ct. App. July 31, 2023). However, as we have previously explained, "[d]etermining whether a parent is willfully and voluntarily underemployed or unemployed are questions of fact that require careful considerations of all the attendant circumstances." *Cain-Swope v. Swope*, 523 S.W.3d 79, 91 (Tenn. Ct. App. 2016) (citing *Richardson v. Spanos*, 189 S.W.3d 720, 726 (Tenn. Ct. App. 2005)). Further, "[i]n making this determination, the court must consider a parent's past and present employment, education, training, ability to work, and any other relevant facts." *Id.* (citing Tenn. Comp. R. & Regs. ch. 1240-02-04-.04(3)(a)(2)(iii)). We review such findings of fact pursuant to Tennessee Rule of Appellate Procedure 13(d), which states, "review of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). This review, "accords substantial deference to the trial court's decision, [ ] especially when it is premised on the trial court's singular ability to ascertain the credibility of the witnesses." *Richardson*, 189 S.W.3d at 726 (citing *Willis v. Willis*, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001); *Lightfoot v. Lightfoot*, No. E2001-00106-COA-R3-CV, 2001 WL 1173297, at *6 (Tenn. Ct. App. Oct. 4, 2001)). "'For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect.'" *Cain-Swope*, 523 S.W.3d at 91 (citing *State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Tr.*, 209 S.W.3d 595, 598-99 (Tenn. Ct. App. 2006)).

The trial court determined Husband was willfully unemployed at the time of trial and that he had been "at different times during the marriage." The trial court noted that "Husband has a history of earning very high incomes over a short period and then being unemployed for periods of time" during which "the family would live off of his high earnings, savings, investments, and credit cards." Consistent with this finding, the trial court stated that it would be unfair to Wife to consider years in which Husband earned zero income or nominal income. The trial court also considered the parties' requests, noting that Husband requested that his income be based on an average of his previous five years of earnings, including several of his low-earning years, for an average of $116,353.20 per year. Conversely, Wife submitted his income should be set at $314,892. The trial court determined that neither suggestion would be "fair under the circumstances." Instead, the trial court took an average of Husband's income for the years 2019 and 2020 which it deemed to be the last years in which Husband was "gainfully employed." Husband's average income in those two years was $252,850.50 per year which the trial court set as Husband's income for child support purposes.

Husband contends that the trial court erred because the evidence demonstrated that he had a "pattern of high-income years followed by periods of lower or no income" and this pattern "was consistent throughout the marriage." Husband asserts that a review of his employment history demonstrates that periods of lower income were not by choice but merely a feature of his occupation. He also points to his testimony and other evidence demonstrating that he dedicated large amounts of time and effort to searching for a new high earning position in addition to a transaction to facilitate. Additionally, he claims that he has "actively pursued multiple CEO and executive-level positions, [by] submitting numerous job applications through platforms like LinkedIn and Indeed," and "[h]is continued search for employment and his efforts to generate income demonstrate that he was not willfully avoiding work." He again asserts that averaging of his income for the past five years is an appropriate method of calculating the income to impute to him.[9]

The trial court supported its determination with an assessment of several of the facts and circumstances surrounding the case. First, the trial court noted that Husband's work history demonstrated that he would earn very high incomes over certain periods of time, but then would follow these with periods of unemployment, during which the family would survive on savings, investments, credit cards, and his high earnings. The trial court also noted Husband's range of income spanned from $411,638 in 2016 to $0 in 2018 and that he was unemployed at the time of the trial. The trial court also considered Husband's desire to facilitate a business acquisition, noting the rarity in such a deal working out, but determined Husband was not justified in choosing not to work simply "because exactly what he wanted was not readily available." Thus, it appears the trial court deemed Husband's decisions to search for a new transaction or to engage in activities which did not provide income during the pendency of the divorce to be unreasonable. The trial court also acknowledged Husband's "education, employment history, success, and earning ability" and juxtaposed these circumstances with Husband's inability to find gainful employment throughout the three years the divorce was pending. The record supports these findings.

Husband holds both an undergraduate degree and an M.B.A. Additionally, Husband has experience working in large business ventures and an impressive resume. He is still relatively young, and nothing in the record indicates that he is presently unable to work. Husband has also hired a former soap opera star as a coach to aid in "packaging" what he does so he "can communicate it." Husband is also consulting on a potential television program. It is unclear why he is not currently being paid for that work, but he could spend

---

[9] We would note that Husband argues that his income should be set at an amount higher than he was earning at the time of trial. Thus, he has essentially conceded a basis existed for imputing income to him based on his earning capacity. *See Schanel v. Richardson*, No. M2022-00800-COA-R3-CV, 2023 WL 6334194, at *26 (Tenn. Ct. App. Sept. 29, 2023) (stating a mother could not "complain that the trial court erred in finding her to be voluntarily underemployed" on appeal where she requested the trial court impute a level of income to her which was higher than that which she actually earned and thus conceded a basis existed for a finding of voluntary underemployment).

that time generating some amount of income. As to Husband's contention that he has filed numerous online applications searching for jobs, the record supports the trial court's decision to give little weight to this claim. At trial, Husband testified that those types of applications were largely ineffective and "as disgusting as online dating." Further, when asked about many of the positions for which he applied, he would not discuss the individual positions or provide additional information about the types of jobs for which he was applying. These facts support a decision to give less weight to Husband's claims regarding his job search. Additionally, while both parties agreed that Husband's income was cyclical, they characterized the reason for this differently. As noted above, Husband claimed he has worked diligently during these times to find a new lucrative job and/or a transaction to facilitate. Meanwhile, Wife described this cycle as, "[h]e would make money, he would either quit or get fired, and we would live off of savings and kind of coast, like, until push [came] to shove, then he'd get a job."

The trial court was clearly unconvinced by Husband's explanations for his unemployment throughout the divorce proceedings and found Wife's description of the situation to be more credible. Strikingly, in another portion of the order, the trial court went so far as to state that it appeared Husband's unemployment during the proceedings "ha[d] been some kind of strategy to gain an advantage in the divorce proceedings." We have previously given credence to a trial court's credibility findings as support for a finding of voluntary underemployment or unemployment. *See Cox v. Cox*, No. M2024-00827-COA-R3-CV, 2025 WL 1517810, at *11 (Tenn. Ct. App. May 28, 2025) (affirming the imputation of income to a party where the trial court determined "Father's testimony concerning his travel, his purported job search, and his actual earning capacity to not be credible."); *Demers v. Demers*, 149 S.W.3d 61, 72 (Tenn. Ct. App. 2003) (finding a trial court did not err where it determined a father's testimony that he did not have the income necessary for child support after the auction of his business was not credible where his siblings began operating the business with no experience out of a building the father owned for no rent and based on the father's lifestyle remaining the same). In our view, the evidence contained in the record does not preponderate against the trial court's finding that Husband was willfully unemployed.

Having determined that the trial court did not err in finding Husband to be willfully unemployed, we now turn to Husband's claim the trial court imputed too much income to him. The Child Support Guidelines provide:

> Once a parent has been found to be willfully underemployed or unemployed, additional income can be allocated to that parent to increase the parent's gross income to an amount which reflects the parent's income potential or earning capacity, and the increased amount shall be used for child support calculation purposes. The additional income allocated to the parent shall be determined using the following criteria:

I. The parent's past and present employment; and

II. The parent's education and training.

Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(II). A determination of willfully underemployed or unemployed parent's potential income is a question "of fact that require[s] careful consideration of all the attendant circumstances." *Richardson*, 189 S.W.3d at 726. "Generally, an award of child support should be set based upon the obligor parent's 'most recent, actual income.'" *Robeson v. Robeson*, No. M2023-01449-COA-R3-CV, 2025 WL 368233, at *7 (Tenn. Ct. App. Feb. 3, 2025) (quoting *Smith v. Smith*, No. M2000-01094-COA-R3-CV, 2001 WL 459108, at *4-5 (Tenn. Ct. App. May 2, 2001)). However, "[w]hen averaging variable income, '[t]he time period to be used lies within the discretion of the trial court based upon the facts of the situation.'" *Id.* (quoting *State ex rel. Moss v. Moss*, No. M2013-00393-COA-R3-CV, 2014 WL 1998738, at *3 (Tenn. Ct. App. Apr. 24, 2014)). This type of discretionary decision is reviewed under the abuse of discretion standard. *Id.*

The trial court calculated the income to impute to Husband by taking an "average of the last two (2) years (2019 and 2020) that Husband was actually gainfully employed" which resulted in an average of $252,850.50 per year. The trial court considered the amounts of imputed income requested by both Husband and Wife but determined that neither number would be fair, noting Husband's figure included years in which he generated either no income or nominal income.

Below and on appeal, Husband contends that an average of his previous five years of earnings would be appropriate in this case. Husband's income tax returns were submitted as an exhibit and set out his income for the years 2008-2022. An average of Husband's last five years of income would result in an average income of $116,353.20 which he asserts fairly accounts for both his years of earning high income and the low earning years which are necessary to generate the high years. Conversely, Wife avers the evidence supports the trial court's decision to impute income of $252,850.50 to Husband.

The trial court relied on several considerations when imputing income to Husband. The trial court noted Husband's history of earnings, as well as his education, employment history, success, and future earning potential when it determined he was willfully unemployed. Each of these considerations are supported by the evidence contained in the record. Husband has both a bachelor's degree and an M.B.A. Likewise, Husband has been the CEO of multiple companies throughout his career and has enjoyed several years of high income. Similarly, Husband's prior earnings indicate his ability to earn at high levels, with him having earned $381,785 in 2020, $411,638 in 2016, and $342,229 in 2015. Further, there is precedent for imputing a high level of income, as our State Supreme Court has similarly imputed a high amount of income to a parent with a history of high earnings, despite recent years of low earnings. *See Brooks v. Brooks*, 992 S.W.2d 403, 407 (Tenn. 1999) (imputing income to the father at $102,087 per year based on his history as a college

graduate and successful business proprietor and land speculator despite his most recent year of adjusted gross income of $25,888).

Likewise, the trial court explained its reasoning as to why it excluded the years of income requested by Husband in its average. The trial court characterized the incomes earned in those years as "nominal" and as non-representative of what Husband had the capability of earning. The trial court also stated it found Husband's lack of employment over the three years the divorce was pending to have been part of some strategy to gain an advantage in the divorce proceedings. While Husband disagrees with this decision, he has not demonstrated the evidence preponderated against it. All in all, the trial court espoused its reasoning for the income it imputed to Husband and that reasoning was supported by the record and the trial court's credibility findings. While we acknowledge that $252,850.50 is a large sum of income, we will not substitute our judgment for that of the trial court. Finding that an evidentiary basis existed to impute income to Husband in the amount of $252,850.50, we affirm.

### D. Alimony

Husband raises several issues regarding the trial court's award of alimony to Wife. "Tennessee recognizes four distinct types of spousal support: (1) alimony *in futuro*, (2) alimony in solido, (3) rehabilitative alimony, and (4) transitional alimony." *Mayfield,* 395 S.W.3d at 115 (citing Tenn. Code Ann. § 36-5-121(d)(1)). In reviewing a trial court's award of alimony, appellate courts must bear in mind that "trial courts in Tennessee have broad discretion to determine whether spousal support is needed and, if so, to determine the nature, amount, and duration of the award." *Mayfield*, 395 S.W.3d at 114. Because decisions regarding spousal support are factually driven and require the balancing of many factors, "the role of an appellate court is not to second guess the trial court or to substitute its judgment for that of the trial court, but to determine whether the trial court abused its discretion in awarding, or refusing to award, spousal support." *Id.* (citing *Gonsewski*, 350 S.W.3d at 105). "'An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.'" *Id.* at 114-115 (quoting *Gonsewski*, 350 S.W.3d at 105).

Tennessee Code Annotated section 36-5-121(i) sets out the factors to be considered by a trial court making a spousal support determination. It provides that:

(i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. §§ 36-5-121(i)(1)-(12).  In addition to these factors, "courts must consider 'the disadvantaged spouse's need and the obligor spouse's ability to pay.'"  *Griffin v. Griffin*, No. M2019-01113-COA-R3-CV, 2020 WL 4873251, at *11 (Tenn. Ct. App. Aug. 19, 2020) (quoting *Gonsewski*, 350 S.W.3d at 110).  "These last two factors are the most important."  *Id.* (citing *Gonsewski*, 350 S.W.3d at 110).

Here, the trial court awarded Wife rehabilitative alimony in the amount of $3,000 per month for 36 months and thereafter $2,000 per month for 60 months.  The trial court also awarded Wife alimony *in futuro* to commence upon the expiration of the rehabilitative alimony in the amount of $1,500 per month.  Alimony *in futuro* is "a form of long-term support" and "is appropriate when the economically disadvantaged spouse cannot achieve self-sufficiency and economic rehabilitation is not feasible." *Mayfield*, 395 S.W.3d at 115 (citing *Gonsewski*, 350 S.W.3d at 107).  Meanwhile, "rehabilitative alimony is short-term support that enables a disadvantaged spouse to obtain education or training and become self-reliant following a divorce." *Id.* (citing *Gonsewski*, 350 S.W.3d at 108).  Notably, the

statute provides that, "[a]n award of alimony *in futuro* may be made, either in addition to an award of rehabilitative alimony, where a spouse may be only partially rehabilitated, or instead of an award of rehabilitative alimony, where rehabilitation is not feasible." Tenn. Code Ann. § 36-5-121(d)(4). Keeping these principles in mind, we now consider Husband's various arguments that the trial court erred in making its alimony determinations.

Husband asserts that the trial court failed to make proper findings of fact in its final order and thus the order did not comply with Tennessee Rule of Civil Procedure 52.01. Husband also claims that the trial court "overstated" his income potential, inaccurately inflating his ability to pay. Additionally, Husband asserts that the trial court improperly awarded alimony *in futuro* to Wife because Wife is capable of rehabilitation. Wife asserts that the trial court did not abuse its discretion when forming the alimony award and states the trial court implicitly relied on her affidavit of income and expenses which was submitted as an exhibit at trial.

Tennessee Rule of Civil Procedure 52.01 requires courts "to make specific findings of facts and conclusions of law following bench trials." *Masserano v. Masserano*, No. W2018-01592-COA-R3-CV, 2019 WL 2207476, at *10 (Tenn. Ct. App. May 22, 2019) (citing Tenn. R. Civ. P. 52.01). Generally, to determine whether a trial court has complied with Rule 52.01 "'the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue.'" *Lovlace v. Copley*, 418 S.W.3d 1, 35 (Tenn. 2013) (quoting 9C Federal Practice and Procedure § 2579, at 328)). Importantly, when considering "an order that does not comply with Rule 52.01, this Court has indicated that we may either review the evidence *de novo* or vacate the judgment and remand to the trial court for the entry of an order compliant with Rule 52.01." *Masserano*, 2019 WL 2207476, at *10 (citing *Gooding v. Gooding*, 477 S.W.3d 774, 783 (Tenn. Ct. App. 2015)).

We have previously found that final orders have not complied with Rule 52.01 in the context of alimony awards where they did not consider the disadvantaged spouse's need and the advantaged spouse's ability to pay. *See Griffin*, 2020 WL 4873251, at *13 (vacating a trial court's award of alimony where the trial court failed "to make sufficient findings of fact regarding Husband's ability to pay the amount of alimony awarded to Wife"); *Masserano*, 2019 WL 2207476, at *11 (vacating a trial court's alimony award where the final order "contain[ed] no specific findings as to Husband's income" and did not "include any findings as to Wife's reasonable expenses"); *Sibley v. Sibley*, No. M2015-01795-COA-R3-CV, 2017 WL 2297652, at *5 (Tenn. Ct. App. May 25, 2017) (vacating a trial court's alimony award where "the Final Decree lack[ed] any discussion of Wife's need or Husband's ability to pay either the rehabilitative alimony or the attorney's fees" and there was also no "determination that Wife had the need to be or was capable of being rehabilitated").

Here, the final order does not contain a specific calculation of Wife's need. The trial court did appear to take the circumstances of the parties into account when making its award as it identified Wife as the disadvantaged spouse and addressed the statutory factors when outlining its award. However, the order does not contain a breakdown explaining Wife's expenses and the amount of those expenses which are offset by her monthly income and award of child support. Thus, we are unable to discern Wife's remaining financial need from the order. Additionally, while the trial court's final order does impute Husband's income at $252,850.50 per year "for child support purposes" it does not state this level of income would also be used for alimony purposes. Further, the order does not otherwise opine on the ability of Husband to pay the alimony award. While it is apparent that the trial court believed Husband has the capacity to earn high amounts of income based on the child support findings and the consideration of his education and work experience, there is not a specific level of income listed for alimony purposes.

Similarly, the trial court did not make any specific findings regarding whether Wife could be rehabilitated. *See Sibley*, 2017 WL 2297652, at *5. It appears the trial court may have considered Wife to be capable of partial rehabilitation as it awarded both alimony *in futuro* and rehabilitative alimony. *See* Tenn. Code Ann. 36-5-121(d)(4). Further, the trial court stated that it would be undesirable for Wife to return to the workforce full time as she would remain responsible for home schooling the children. However, there was not a specific finding regarding the extent to which Wife could be rehabilitated despite the presence of competing arguments from Husband and Wife regarding her future employment prospects. Wife averred at trial that she anticipated an earning capacity of approximately $2,000 per month and she would be able to accomplish this while still homeschooling the children. The trial court noted this testimony in its final order but did not make a finding instituting this level of income for alimony purposes. Conversely, Husband claims she can make more money as a full-time real estate agent. Husband also appears to contend that the children should be placed in public school so Wife can work full-time.

While Wife is unlikely to reach a similar earning capacity as Husband in either scenario, the extent to which she may be rehabilitated still bears on the amount of alimony appropriate under the circumstances. The trial court clearly intended for her to continue homeschooling the children which would affect the extent to which Wife could be rehabilitated as it would likely prevent her from working full-time. Regardless, while the concept of rehabilitation is explained in the order and an award of rehabilitative alimony was made, there were no specific findings as to the degree to which Wife could be rehabilitated, the amount of income she would have the capacity to earn in the future, or the effect this would have on her need for alimony presently and in the future.

Having reviewed the trial court's order, we agree with Husband that the findings were inadequate to comply with Rule 52.01. There were no specific findings establishing the amount of Wife's need or Husband's ability to pay an award. Nor was there a tacit

- 33 -

explanation as to the extent to which Wife could be rehabilitated. As stated above, when an order fails to comply with Rule 52.01, we are permitted to either conduct a *de novo* review of the record or vacate the judgment and remand to the trial court for entry of a compliant order. *Masserano*, 2019 WL 2207476, at *10. Given that several findings are necessary beyond Wife's need which the parties assert is ascertainable, we decline to review the issue. Accordingly, we vacate the trial court's alimony award and remand for reconsideration of the amount of alimony based on Wife's need and Husband's ability to pay, and for consideration of the extent to which Wife is capable of being rehabilitated.

### E. Attorney's Fees Awarded to Wife

Husband's final issue revolves around the award of attorney's fees to Wife. Prior to the trial, the trial court entered two orders requiring Husband to withdraw funds from the parties' investment accounts to pay Wife's attorney's fees from the marital estate. In its final order, the trial court awarded Wife a judgment in the amount $43,407.50 "for her attorney's fees and costs incurred in this matter, for which execution shall issue, if necessary[.]" This was equal to the total amount incurred in fees listed in Wife's affidavit of attorney's fees. However, the attached invoice also contained a value of $0.00 in the "Amount Paid" section.

Husband claims that Wife's fees were already paid out of the marital estate, and the trial court did not properly consider Wife's need in forming the award as Wife did not lack funds to pay an already satisfied bill. Wife asserts that there was no error as Husband was not being forced to pay the fees twice. She further contends that any fees which were paid prior to the trial were paid from the marital estate and thus Husband is not being forced to pay the same fees twice as she was viewed as having contributed to the value of the marital estate as a homemaker.

"In a divorce case, an award of attorney's fees is treated as an award of alimony *in solido*." *Eldridge*, 137 S.W.3d at 24. Accordingly, when a trial court considers "whether to award attorney's fees, the trial court is required to consider the same factors used when considering a request for alimony." *Id.* (citing *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995)). Thus, the trial court again must consider the need of the disadvantaged spouse. *Id.* at 24-25 (citing *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996)). The issue of attorney's fees in divorce proceedings is "largely left within the discretion of the trial court and will not be disturbed on appeal unless the trial court clearly abused that discretion." *Id.* at 25 (citing *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn. 1995)).

As explained above, Tennessee Rule of Civil Procedure 52.01 requires courts "to make specific findings of facts and conclusions of law following bench trials." *Masserano*, 2019 WL 2207476, at *10 (citing Tenn. R. Civ. P. 52.01). Generally, to determine whether a trial court has complied with Rule 52.01 "'the findings of fact must include as much of

the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue.'" *Lovlace*, 418 S.W.3d at 35 (quoting 9C Federal Practice and Procedure § 2579, at 328)). Importantly, when considering "an order that does not comply with Rule 52.01, this Court has indicated that we may either review the evidence *de novo* or vacate the judgment and remand to the trial court for the entry of an order compliant with Rule 52.01." *Masserano*, 2019 WL 2207476, at *10 (citing *Gooding*, 477 S.W.3d at 783).

The trial court determined that Wife was the disadvantaged spouse and found Husband to be capable of earning a level of income Wife would not be able to meet. However, as noted above, while the trial court made findings regarding Husband's earning ability for child support purposes, it did not do so for purposes of alimony. Considering this, we cannot say there were specific findings for the award to comply with Rule 52.01.

As stated above, when an order fails to comply with Rule 52.01, we are permitted to either conduct a *de novo* review of the record or vacate the judgment and remand to the trial court for entry of a compliant order. *Masserano*, 2019 WL 2207476, at *10. Here, there would appear to be more of a basis to conduct a review of the order based on the specific amount of attorney's fees which were awarded. Unfortunately, the outstanding balance of fees owed to Wife's attorneys is unclear. Two orders were entered by the trial court requiring Husband to withdraw funds from the couple's retirement accounts to pay Wife's attorneys: one ordering a $15,000.00 payment on October 23, 2023, and one ordering a $18,036.00 payment on November 20, 2023. This would total $33,036.00 in fees ordered prior to the trial. However, Wife's attorneys submitted their total fee calculation on March 6, 2024, which listed the total amount of fees charged over the life of the case as $43,407.50. This document lists the amount paid on Wife's fees as $0.00, but it appears based on the testimony at trial that the amounts listed in the pre-trial orders had been paid prior to trial. When subtracting the amount of fees required by the pre-trial orders from the full amount accrued, the balance is left at $10,371.50 of outstanding fees.

There would be no apparent error in requiring Husband to pay $10,371.50 in outstanding attorney fees, all of which accrued after the trial court entered the two pre-trial fee orders referenced above. Wife's attorney fee of $33,036.00 was ordered to be paid prior to the divorce proceedings from marital funds. Therefore, Husband would owe Wife $16,518.00 for the attorneys' fees that have already been paid, rather than the full amount paid. Assuming that the fees reflected in the pre-trial orders have been paid, requiring Husband to now pay the full amount would result in him having paid $59,925.50 while the total fees charged only amounted to $43,407.50. While it is logical for the court to potentially hold Husband responsible for the fees, it is illogical to force him to pay $16,518.00 in excess of the actual fees charged.

Having reviewed the trial court's order, the findings were inadequate to comply with Rule 52.01. There were no specific findings establishing Husband's ability to pay an award

and the amount of fees which have been paid out of the marital estate and those which remain outstanding are unclear. Accordingly, we vacate the trial court's award of attorney fees and remand for reconsideration of the amount of attorney fees based on Wife's need, Husband's ability to pay, and for a proper calculation of the attorney's fees. Thus, we vacate the award of attorney's fees to Wife in the form of alimony *in solido*, and remand for reconsideration in light of the findings made on its reconsideration of the award of rehabilitative alimony and alimony *in futuro*, as well as consideration of the fees outstanding and those presumed to have been paid from Husband's portion of the marital estate.

### F. Wife's Claim for Attorney's Fees on Appeal

Wife's sole claim is that she should be awarded attorney's fees incurred on appeal pursuant to Tennessee Code Annotated section 36-5-103(c) (2021). Wife claims that as Husband challenged the child support order, the attorney's fees generated on appeal were done so on behalf of the children. She also asserts that attorney's fees on appeal would be appropriate "on equitable grounds" based on her inability to pay, Husband's lack of success on appeal, and her exhibition of good faith throughout the proceedings. Tennessee Code Annotated section 36-5-103(c) provides:

> (c) A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the non-prevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

Tenn. Code Ann. § 36-5-103(c) (2018). The decision to award fees on appeal based on the operation of the statute is one which remains within the discretion of this court. *Eberbach v. Eberbach*, 535 S.W.3d 467, 477 (Tenn. 2017) (stating that "when appellate attorney's fees are requested pursuant to statutes like [ ] section 36-5-103(c), which expressly permit the court to exercise its discretion, the Court of Appeals should analyze any such request by exercising its discretion to determine whether an award to the prevailing party is appropriate").

It has been established through this case that Wife is the disadvantaged spouse whereas the Husband has a substantial earning capacity. Further, a portion of this appeal was predicated on the calculation of Husband's income for child support purposes and thus, Wife was required to defend that portion of the appeal on the children's behalf. However, Husband has been successful on portions of his appeal, and there is no indication that Husband has failed to act in good faith during the pendency of this appeal. Accordingly, we decline to award attorney's fees to Wife on appeal.

# IV. Conclusion

For the foregoing reasons, we vacate the trial court's order as it pertains to the awards of alimony *in solido* and rehabilitative alimony and remand so the trial court may make adequate findings of fact pursuant to rule 52.01. We affirm the trial court's division of marital property but remand the order so it may be revised to include a provision requiring the mortgage be refinanced into Wife's name by a date to be determined by the trial court and to include a provision for Wife to hold Husband harmless from any liability associated with the debt. We affirm the parenting schedule adopted by the trial court. Further, we affirm the trial court's determination that Husband was willfully unemployed at the time of the trial and at various times throughout the marriage and its imputation of income to Husband. Likewise, we affirm the award of attorney's fees made to Wife below but must vacate the award and remand for specificity in the amount of fees awarded to Wife to ensure Husband is not overcharged. Finally, we decline to award Wife her attorney's fees on appeal. Costs on appeal are assessed one-half to the appellant, Ryan Keith Addis and one-half to the appellee, Rosalynn Victor Addis, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE